# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DARLENE R. MULLINS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:04cv00082 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | **By:  PAMELA MEADE SARGENT** |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

Plaintiff, Darlene R. Mullins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:04-cv-00082-PMS   Document 17   Filed 07/08/05   Page 1 of 26   Pageid#: 74

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed her applications for DIB and SSI on or about August 13, 2002, alleging disability as of March 14, 2002, based on chronic obstructive pulmonary disease, ("COPD"),[1] right shoulder pain, "nervous" problems, fatigue, chest pain, wheezing and difficulty concentrating. (Record, ("R."), at 49-52, 56, 86, 277-80.) Mullins's claims were denied both initially and on reconsideration. (R. at 29-33, 34, 35-37, 282-84, 286-88.) Thereafter, Mullins requested a hearing before an administrative law judge, ("ALJ"), (R. at 38.) A hearing was held on March 29, 2004, at which Mullins was represented by counsel. (R. at 294-315.)

By decision dated May 4, 2004, the ALJ denied Mullins's claims. (R. at 14-21.) The ALJ found that Mullins met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 20.) The ALJ found that Mullins had not engaged in substantial gainful activity since March 14, 2002. (R.

---

[1]COPD refers to any disorder, e.g. asthma, chronic bronchitis and pulmonary emphysema, marked by persistent obstruction of bronchial air flow. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 483 (27th ed. 1988).

at 20.)  The ALJ also found that Mullins had severe impairments, namely COPD, left shoulder pain and an adjustment disorder with depression, but he found that Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 20.)  The ALJ further found that Mullins's allegations regarding her limitations were not totally credible.  (R. at 20.)  The ALJ concluded that Mullins had the residual functional capacity to perform simple, unskilled light[2] work that did not require repetitive use of the nondominant left arm, and that did not require work around dust, fumes, vapors or other respiratory irritants.  (R. at 20.)  Based on Mullins's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Mullins could perform her past relevant work as a cashier.  (R. at 20.)  Thus, the ALJ found that Mullins was not under a disability as defined by the Act and was not eligible for benefits.  (R. at 21.)  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004).

After the ALJ issued this decision, Mullins pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review.  (R. at 6-9.)  Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. §§ 404.981, 416.1481 (2004).  The case is before this court on Mullins's motion for summary judgment filed March 2, 2005, and on the Commissioner's motion for summary judgment filed April 4, 2005.

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2004).

-3-

## II. Facts

Mullins was born in 1972, (R. at 49, 277), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2004). She has a tenth-grade education and past work experience as a sewing machine operator, a cashier and a cleaner in a nursing home. (R. at 57, 62.)

At her hearing, Mullins testified that she could do very little without wheezing, experiencing shortness of breath and a racing heartbeat and having to take breathing medication. (R. at 298.) She stated that she was being treated by Dr. Boodram, who had prescribed two inhalers, a nebulizer and various other breathing medications. (R. at 298.) Mullins further stated that Dr. Boodram treated her for anxiety and panic attacks, which she had experienced for a year or more and for which Dr. Boodram also had prescribed medication. (R. at 298-300.) She testified that the medication was not working completely, in that she continued to experience panic attacks weekly. (R. at 300.) Mullins testified that she also was treated at Wise County Behavioral Health Services, ("WCBHS"), as a result of a court order due to some domestic violence issues, her alcohol consumption and her husband's drug use. (R. at 299.) Mullins testified that she occasionally drank, "but hardly ever." (R. at 299.) She described her panic attacks as feeling like a heart attack, chest burning, heart pounding and feeling very panicky and shaky. (R. at 300.) She stated that these attacks lasted for an hour or longer. (R. at 300.) Mullins testified that she continued to suffer from depression, experiencing irritability and crying spells one to three times per week. (R. at 300.) She stated that Dr. Boodram had prescribed medication for her depression. (R. at 300-01.)

Case 2:04-cv-00082-PMS   Document 17   Filed 07/08/05   Page 4 of 26   Pageid#: 77

Mullins, who is right-handed, testified that she also experienced pain in her left shoulder, making it difficult for her to raise her arm. (R. at 301.) She stated that Dr. Boodram prescribed muscle relaxers and referred her to another physician for evaluation. (R. at 301.)

Mullins described a typical day as including getting her son off to school and washing some dishes. (R. at 301.) She testified that her mother performed the grocery shopping, laundry and vacuuming and helped with her daughter. (R. at 301.) Mullins stated that she did not usually go out in public because she lacked energy and walking made her become wheezy and short of breath, requiring her to sit down. (R. at 301-02.) She stated that she no longer had any hobbies. (R. at 302.)

Mullins testified that she could stand and walk around for approximately 10 minutes before beginning to wheeze. (R. at 302.) She stated that had stopped smoking in the past, but started back, stating that, at that time, she was smoking approximately three cigarettes per day. (R. at 302.) Mullins testified that the more she walked around, the more she had to use her breathing treatments. (R. at 302.) She further stated that, regardless of how clean her environment was, she had to take breathing treatments approximately every two to three hours. (R. at 303.) Mullins testified that it took approximately 30 minutes for these breathing treatments to take effect. (R. at 303.) She further testified that she had to use a nebulizer at home at least four to five times a day even if she was not exerting herself. (R. at 304.)

Dr. Theron Blickenstaff, M.D., a medical expert, also was present and testified at Mullins's hearing. (R. at 305-08.) Dr. Blickenstaff testified that the pulmonary

function testing performed in March 2003, if taken at face value, appeared to indicate some mild obstruction. (R. at 305.) However, Dr. Blickenstaff noted that Mullins's effort was erratic, making it impossible to adequately evaluate the flow volume. (R. at 305.) Dr. Blickenstaff further testified that chest x-rays had mostly been interpreted as normal with the exception of a couple of hospitalizations for pneumonia-type problems. (R. at 305.) He stated that physical examinations had sometimes described expiratory wheezing, and arterial blood gases performed in February 2003 were slightly abnormal, but not severe. (R. at 305.) However, Dr. Blickenstaff opined that the objective medical evidence of record did not support a severe lung impairment, but only the need to avoid exposure to fumes, vapors, dust and other pulmonary irritants. (R. at 305-06.) He further testified that because the objective evidence did not support a lung impairment of such severity, Mullins's subjective allegations of having to use a nebulizer as often as reported also were not supported. (R. at 307.)

Dr. Blickenstaff testified that, with regard to Mullins's left shoulder, the objective medical evidence supported a limitation on reaching with the left arm. (R. at 306.) However, he noted no need to impose overall exertional limitations. (R. at 306.)

Dr. Thomas Schacht, M.D., another medical expert, also was present and testified at Mullins's hearing. (R. at 308-10, 311-12.) Dr. Schacht noted that although treatment notes and pharmacy records reflected prescriptions for various psychotropic medications, including Xanax, BuSpar, Lexapro and Wellbutrin, such medications were not prescribed to treat psychiatric problems, but to facilitate smoking cessation. (R. at 309.) Dr. Schacht testified that Mullins was seen at WCBHS on May 23, 2003,

-6-

at which time she complained of some residual anxiety and depressive symptoms. (R. at 309.) Although a symptom checklist was contained in the intake evaluation, none of her symptoms were rated as severe. (R. at 309.) Instead, symptoms of reduced energy and fatigue, anxiety, depressed mood and insomnia were rated as moderately severe, while anger, apathy and tearfulness were rated as mild. (R. at 309.) Cognitive functioning, memory functioning, attention, concentration and perceptual and thinking abilities were rated as having no impairments. (R. at 309-10.) Dr. Schacht noted that there was only one follow-up note from July 21, 2003, which states that Mullins was continuing to struggle with alcohol given the fact that she stated, at that time, she had been sober for only one week. (R. at 310.) Dr. Schacht concluded that it would be unnecessary to send Mullins for a psychiatric consultative examination given the lack of records regarding any mental impairment with which to correlate it. (R. at 310.) Dr. Schacht testified that a Global Assessment of Functioning, ("GAF"), score of 50[3] would not necessarily be work preclusive. (R. at 311-12.) Instead, he noted that it would be dependent on what sort of problems earned such a score. (R. at 311.) Moreover, Dr. Schacht noted that a previous GAF score of 60[4] indicated that Mullins's GAF of 50 was an acute problem, not a persistent one. (R. at 311-12.) Finally, Dr. Schacht noted the difficulty in separating out Mullins's impairments from her alcohol abuse, which was her primary diagnosis. (R. at 312.)

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

[4]A GAF of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

Cathy Sanders, a vocational expert, also was present and testified at Mullins's hearing. (R. at 310-11, 312-14.) Sanders classified Mullins's past relevant work as a waitress as light and unskilled, a sewing machine operator as light and semiskilled and various cashier positions as ranging from light to medium[5] and unskilled. (R. at 311.) Sanders was asked to assume a hypothetical individual of low average intelligence, who could not repetitively use her left shoulder and who could not work around dust, fumes, vapors or other pulmonary irritants. (R. at 311.) Sanders testified that such an individual, assuming the left arm was not the dominant arm, could perform jobs existing in significant numbers in the national economy, including those of a food preparer, a messenger, a machine operator, a machine inspector and a machine feeder. (R. at 311.) Sanders was next asked to consider an individual limited as set forth in Dr. Boodram's physical assessment dated March 11, 2004. (R. at 253-56, 312.) Sanders testified that such an individual could perform jobs existing in significant numbers in the national economy at a limited sedentary[6] level, including those of a cashier or food checker, an information clerk, an interviewer and a seated greeter or gate guard. (R. at 313.) Finally, Sanders was asked whether there would be any jobs available for an individual limited as set forth in Mullins's testimony. (R. at 313.) She stated that there would be no jobs available. (R. at 313.) Sanders testified that an individual who had to use a nebulizer at work generally could not perform any jobs. (R. at 314.)

---

[5]Medium work involves lifting items weighing up to 50 pounds at a time with lifting or carrying of items weighing up to 25 pounds frequently. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2004).

[6]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2004).

-8-

In rendering his decision, the ALJ reviewed records from Wise County School System; Dr. Kathleen A. DePonte, M.D.; Dr. Kadarnath Boodram, M.D.; Norton Community Hospital; Howard Leizer, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; St. Mary's Hospital; St. Mary's Health Care Associates; Dr. S.C. Kotay, M.D.; Dr. Thomas Brian Cortellesi, M.D.; Robert E. Botts, an optometrist; and Wise County Behavioral Health Services.

On January 30, 1999, Mullins saw Dr. Thomas Brian Cortellesi, D.O., at St. Mary's Hospital, with complaints of shortness of breath. (R. at 195-97.) A chest x-ray showed right upper lobe pneumonia and interstitial lung markings in a fine reticular pattern. (R. at 195, 252.) She exhibited bilateral wheezing, was given a breathing treatment and was admitted to the hospital. (R. at 195.) Mullins reported smoking one pack of cigarettes per day for the previous 15 years and drinking an occasional beer. (R. at 196.) Dr. Cortellesi noted bilateral wheezing throughout all lung fields, but equal breath sounds. (R. at 197.) Mullins was discharged on February 2, 1999. (R. at 193.) Diagnoses upon discharge were right upper lobe pneumonia, acute exacerbation of reactive airway disease, ("RAD"), and tobacco abuse. (R. at 192-93.) She was advised to use the Nicoderm patch. (R. at 194.) On February 16, 1999, Dr. Cortellesi performed pulmonary function testing which revealed minimal obstructive airway disease. (R. at 247-51.) The following day, Mullins reported that she had cut back to smoking five to six cigarettes per day. (R. at 246.) Karen Stallard, a nurse practitioner at St. Mary's, diagnosed Mullins with RAD or possible

COPD, tobacco abuse and status-post right upper lobe pneumonia. (R. at 246.) She was again advised to stop smoking and to use inhalers as prescribed. (R. at 246.) She was seen again on March 29, 1999, for a follow-up evaluation. (R. at 245.) Mullins relayed a history of COPD, and she stated that she continued to smoke one pack of cigarettes per day. (R. at 245.) A physical examination revealed scattered expiratory wheezes. (R. at 245.) Mullins was diagnosed with COPD and tobacco abuse and was again advised to stop smoking. (R. at 245.) However, on June 24, 1999, Mullins reported that she continued to smoke one pack of cigarettes per day. (R. at 244.) A physical examination revealed decreased breath sounds, a few rhonchi and scattered wheezes. (R. at 244.) Mullins was diagnosed with chronic bronchitis and nicotine abuse. (R. at 244.) She was prescribed Wellbutrin and was counseled on smoking cessation. (R. at 244.)

On June 27, 2000, Mullins presented to the emergency department at St. Mary's Hospital with complaints of shortness of breath, cough and chest discomfort since the previous night. (R. at 185.) Her lung sounds were clear and her respiration was normal. (R. at 185.) She stated that she had a history of COPD. (R. at 185.) However, chest x-rays ordered by Dr. Kathleen A. DePonte, M.D., revealed no active cardiopulmonary disease. (R. at 186.) She was diagnosed with bronchitis and tobacco abuse. (R. at 184.) On January 15, 2001, Mullins again presented to the emergency department with complaints of lower chest pain after falling the previous day and hitting her chest on a banister. (R. at 180, 183.) Chest x-rays again showed no active lung disease. (R. at 182.) She was diagnosed with bronchitis, intercostal muscle strain and tobacco abuse. (R. at 183.) On September 10, 2001, Mullins presented to St. Mary's Hospital in labor with her second child. (R. at 199-200.) At that time, she

-10-

reported that she had continued to smoke one-half to one pack of cigarettes per day in spite of being strongly advised to stop smoking. (R. at 199.) Mullins was diagnosed with severe aspiration pneumonia. (R. at 212.) A fiberoptic bronchoscopic examination was performed on September 15, 2001, to rule out mucous plugging. (R. at 219-20.) Mullins was diagnosed with acute hypoxemic respiratory failure improving with steroid therapy and probable medication allergy or pneumonitis secondary to collagen diseases. (R. at 219.) She was continued on steroid therapy. (R. at 219.)

Mullins saw Dr. Kadarnath Boodram, M.D., from March 1, 2002, to June 5, 2003. (R. at 105-42.) Over this time period, Mullins was diagnosed with atypical chest pain, COPD, tobacco abuse, right foot pain, gastroesophageal reflux disease, ("GERD"), panic attacks, weight loss, exertional dyspnea, palpitations, laryngitis/bronchitis, musculoskeletal pain, anxiety, costochondritis[7] and right shoulder tendinitis. (R. at 105, 106, 108, 111, 113, 114, 118, 120, 123, 126.) She was treated with inhalers, Wellbutrin, Advair, Rocephin , Solumedrol, Xanax, Ultram and Celebrex. (R. at 105, 106, 108, 113, 116, 118, 120, 123, 126.) On April 8, 2002, Dr. Boodram noted that Mullins was "doing well respiratory wise." (R. at 123.) Mullins noted panic attacks. (R. at 123.) On August 8, 2002, Dr. Boodram noted respiratory wheezing. (R. at 120.) Mullins underwent pulmonary function testing on August 30, 2002, which revealed moderately severe obstructive airway disease. (R. at 140-42.) However, it was noted that Mullins's "effort was erratic which makes it impossible to adequately evaluate the flow volume loops." (R. at 142.) She was

_____

[7]Costochondritis is an inflammation of the rib and its cartilage. *See* Dorland's at 389, 863.

given smoking cessation materials.  (R. at 140.)  On October 26, 2002, Mullins again complained of chest pain.  (R. at 178.)  However, a chest x-ray showed no active cardiopulmonary disease.  (R. at 136, 179.)  She was diagnosed with anxiety and alcohol intoxication.  (R. at 178.)  A few days later, an echocardiogram, ("EKG"), revealed normal left ventricular systolic function, and a CT scan of the thorax was normal.  (R. at 134-35.)On November 4, 2002, December 10, 2002, and January 7, 2003, expiratory wheezing was again noted.  (R. at 113, 114, 118.)

On February 16, 2003, Mullins presented to Norton Community Hospital with complaints of chest pain with associated nausea and vomiting.  (R. at 148-50.)  A chest x-ray showed no acute infiltrate, cardiac enzymes were normal and an EKG was within normal limits.  (R. at 148.)  She was admitted to rule out a myocardial infarction, which was ruled out.  (R. at 148, 150.)  Mullins reported smoking one-half a pack of cigarettes per day and occasionally drinking alcohol.  (R. at 148.)  She denied shortness of breath, cough, wheeze or sputum production.  (R. at 149.)  A physical examination revealed a normal rate and rhythm of the heart with no murmurs, but mild pain with palpation of the costochondral junctions.  (R. at 149.)  Mullins's lungs were clear to auscultation bilaterally.  (R. at 149.)  She was discharged the following day with diagnoses of atypical chest pain rule out myocardial infarction, COPD, cigarette addition and anxiety.  (R. at 146.)   It was noted that Mullins had COPD, secondary to cigarette smoking, and the need to stop smoking was discussed. (R. at 147.)  She was advised to perform activities as tolerated and to continue using inhalers.  (R. at 147.)  She was prescribed Toradol and Lortab.  (R. at 147.)

On February 25, 2003, Mullins again saw Dr. Boodram, noting a hot feeling in

-12-

the chest area. (R. at 110.) A stress test and pulmonary function testing were scheduled. (R. at 110.) On March 20, 2003, a Cardiolite myocardial perfusion study was performed, revealing normal cardiac wall motion. (R. at 132-33.) On April 1, 2003, Mullins presented yet again with chest pain. (R. at 176.) Chest x-rays again revealed no active cardiopulmonary disease. (R. at 177.) Mullins was again advised to stop smoking. (R. at 176.) On April 7, 2003, Mullins continued to complain of chest pain. (R. at 108.)

On April 9, 2003, Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), concluding that Mullins suffered from a nonsevere anxiety-related disorder. (R. at 152-66.) Leizer noted no hospitalizations or treatment by any mental health professional. (R. at 166.) He further noted Mullins's reported activities of daily living to include preparing meals, performing laundry, vacuuming, washing dishes, dusting, weekly grocery shopping, helping her son get ready for school and reading. (R. at 166.) Leizer reported that Mullins tired easily, having to rest frequently throughout the day and use a nebulizer. (R. at 166.) Leizer opined that, given Mullins's reported activities of daily living, and her contention that she is limited only by physical complaints, her condition did not prevent her from working. (R. at 166.) Leizer found no evidence of a severe mental impairment and found Mullins's allegations of a psychiatric impairment to be only partially credible. (R. at 166.) Leizer's conclusions were affirmed by Julie Jennings, Ph.D., another state agency psychologist, on August 4, 2003. (R. at 152.)

The same day, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Mullins

-13-

could perform medium work. (R. at 167-75.) Dr. Johnson noted that the evidence revealed that Mullins had COPD, but retained adequate breathing ability. (R. at 169.) He further noted that, despite complaints of chest pain and shortness of breath, her heart was functioning satisfactorily and she was able to perform many ordinary activities. (R. at 169.) Therefore, Dr. Johnson concluded that Mullins's condition did not preclude her from all work activity and that she could perform medium work. (R. at 169.) He further noted that Mullins's allegations were only partially credible. (R. at 169.) Dr. Johnson found no postural, manipulative, visual, communicative or environmental limitations. (R. at 170-72.) Dr. Johnson's findings were affirmed by Dr. Donald R. Williams, M.D., another state agency physician. (R. at 175.)

On April 29, 2003, Dr. Boodram diagnosed costochondritis and right shoulder tendinitis, among other things. (R. at 106.) Mullins was prescribed Celebrex. (R. at 106.) A chest x-ray on May 16, 2003, revealed clear lungs and intact left ribs. (R. at 131.) On June 5, 2003, Mullins continued to complain of chest pain. (R. at 105.) A physical examination revealed midsternal pain on palpation. (R. at 105.) She was diagnosed with atypical chest pain most likely costochondritis. (R. at 105.)

Mullins was seen at WCBHS from May 23, 2003, to July 21, 2003. (R. at 263-76.) Intake notes reveal that Mullins was referred for domestic violence counseling, mental health counseling and substance abuse counseling. (R. at 268, 275.) Mullins reported being off of alcohol, but continued to struggle with depression and anxiety. (R. at 268, 275.) A "Symptom Checklist" revealed that Mullins experienced mild social withdrawal, anger, apathy and tearfulness and moderate fatigue, anxiety, jitteriness, panic attacks, worrying, depressed mood, irritability, insomnia and report

-14-

of abuse or neglect.[8]  (R. at 265-67.)  Mullins reported becoming intoxicated once or twice per week.  (R. at 269, 270.)  She was diagnosed with a adjustment disorder with depression, alcohol abuse, nicotine dependence and a GAF score of 50.  (R. at 269, 272.)  However, it was noted that Mullins's highest GAF score in the previous six months was 60.  (R. at 269.)  Mullins reported taking care of her children, performing housework, watching television and talking to friends.  (R. at 274.)

On June 4, 2003, Mullins saw Robert E. Botts, an optometrist, with complaints of a growth on her right lower eyelid.  (R. at 259-61.)  She was diagnosed with a conjunctiva disorder of the right eye.  (R. at 260.)  A biopsy was scheduled.  (R. at 260-61.)  On February 24, 2004, Mullins again presented to Botts.  (R. at 257.)  She reported smoking 10 cigarettes per day, but denied drinking alcohol or taking drugs.  (R. at 257.)  However, Botts noted as follows: "Strong odor of [alcohol] on breath noted by tech [and] me!"  (R. at 257.)

On July 8, 2003, Mullins was seen at St. Mary's Health Care Associates with complaints of chest pain.  (R. at 233.)  A chest x-ray showed patchy density over the right lower lung field, rib lesion versus focal pneumonia.  (R. at 242.)  She was again diagnosed with left shoulder tendinitis, COPD and anxiety.  (R. at 233.)  She was prescribed Celebrex and Nexium.  (R. at 233.)  On September 15, 2003, Mullins complained of coughing for the previous week.  (R. at 230-31.)  She was diagnosed with bronchitis, COPD, postnasal drip and costochondritis and was given a breathing treatment.  (R. at 231.)  On October 22, 2003, a physical examination showed midsternal pain, expiratory wheezing and left shoulder pain.  (R. at 229.)  Her

---

[8]It is unclear whether Mullins rated these abilities or whether the examiner rated them.

-15-

diagnoses remained unchanged. (R. at 229.) On November 12, 2003, a chest x-ray revealed partial clearing of the right parahilar infiltrate. (R. at 240.) The following day, a CT scan of the thorax revealed right parahilar consolidation involving the right upper, middle and lower lobes and a small left pleural effusion. (R. at 238.) On December 3, 2003, Mullins's diagnoses again remained unchanged. (R. at 227.) She was prescribed BuSpar. (R. at 227.) An x-ray of the left shoulder performed on December 10, 2003, showed no fracture or dislocation. (R. at 237.) On December 17, 2003, Mullins complained of coughing for the previous week. (R. at 224-25.) A physical examination revealed expiratory wheezing and left shoulder tendinitis. (R. at 225.) Her diagnoses were the same as previously. (R. at 225.) An MRI of the left shoulder, performed on January 5, 2004, showed no significant abnormality. (R. at 235.)

On March 11, 2004, Dr. Boodram completed a physical assessment, finding that Mullins could lift and/or carry items weighing up to 10 pounds both frequently and occasionally, that she could stand and/or walk for less than two hours each in an eight-hour workday, that she could sit for about six hours in an eight-hour workday and that she was limited in her upper extremities in the ability to push and/or pull. (R. at 253-56.) Nonetheless, Dr. Boodram opined that Mullins could frequently climb, balance, kneel, crouch, crawl and stoop. (R. at 254.) He concluded that she was limited in her abilities to reach, to handle objects, to finger objects and to feel. (R. at 255.) Finally, Dr. Boodram opined that Mullins should avoid exposure to temperature extremes, dust, vibration, humidity, hazards such as heights and machinery and fumes, odors, chemicals and gases. (R. at 256.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2004).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 4, 2004, the ALJ denied Mullins's claims. (R. at 14-21.) The ALJ found that Mullins met the disability insured status requirements of the Act

-17-

for disability purposes through the date of the decision. (R. at 20.) The ALJ found that Mullins had not engaged in substantial gainful activity since March 14, 2002. (R. at 20.) The ALJ also found that Mullins had severe impairments, namely COPD, left shoulder pain and an adjustment disorder with depression, but he found that Mullins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18, 20.) The ALJ further found that Mullins's allegations regarding her limitations were not totally credible. (R. at 20.) The ALJ concluded that Mullins had the residual functional capacity to perform simple, unskilled light work that did not require repetitive use of the nondominant left arm, and that did not require work around dust, fumes, vapors or other respiratory irritants. (R. at 20.) Based on Mullins's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Mullins could perform her past relevant work as a cashier. (R. at 20.) Thus, the ALJ found that Mullins was not under a disability as defined by the Act and was not eligible for benefits. (R. at 21.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004).

In her brief, Mullins argues that the ALJ erred in his residual functional capacity finding. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-9.) Mullins also argues that the ALJ erred by posing an incomplete hypothetical to the vocational expert in concluding that she was not disabled. (Plaintiff's Brief at 10-13.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This

court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Mullins first argues that the ALJ erred by finding that she retained the functional capacity to perform simple, unskilled light work that did not require repetitive overhead use of the left arm and that did not require work around dust, fumes, odors or other respiratory irritants. (Plaintiff's Brief at 6-9.) I first find that the ALJ's residual functional capacity finding with regard to Mullins's alleged physical impairments is supported by substantial evidence.

-19-

The objective medical evidence reveals that Mullins suffers from COPD secondary to cigarette smoking. Although Mullins alleges that her lung impairment has worsened, requiring her to use inhalers and a nebulizer throughout the day, one of the medical experts, Dr. Blickenstaff, testified that the objective evidence did not support such subjective allegations given that the evidence of record did not support the existence of a lung impairment of sufficient severity to warrant such frequent use of inhalers and a nebulizer. (R. at 307.) For instance, it was noted during the pulmonary function testing performed in August 2002 that Mullins's effort was erratic, thus, making it impossible to adequately evaluate the flow volume. (R. at 142.) Moreover, as Dr. Blickenstaff noted, the results of several chest x-rays are contained in the record on appeal, the majority of which yielded normal results, the exception being some pneumonia-type problems. (R. at 195, 212, 238, 252.) Furthermore, as noted by Dr. Blickenstaff, several references are made to expiratory wheezing, but the only restrictions placed on Mullins were by Dr. Boodram, who found that she should avoid exposure to temperature extremes, dust, vibration, humidity, hazards such as heights and machinery and fumes, odors, chemicals and gases. (R. at 256.) The ALJ expressly imposed these restrictions in his physical residual functional capacity finding. Moreover, I note that Mullins was repeatedly advised to stop smoking. (R. at 140, 199, 245, 246.) However, it appears that she was never able to do so, and even reported smoking one-half to one pack of cigarettes per day throughout her pregnancy with her second child. (R. at 199.)

Next, although Mullins complained several times of chest pain, x-rays and CT scans were consistently normal. (R. at 131, 135, 136, 148, 177, 179, 182, 186, 242.) No restrictions were placed on Mullins as a result of such chest pain. Myocardial

infarction was ruled out, and these chest pains were ultimately attributed to costochondritis. (R. at 105, 150.) The state agency physicians concluded that Mullins could perform medium work, noting that she retained adequate breathing ability, her heart was functioning satisfactorily and she performed many activities of daily living, including preparing meals, performing laundry, vacuuming, washing dishes, dusting, weekly grocery shopping, helping her son get ready for school and reading. (R. at 166, 169.)

Finally, the record reveals that Mullins has complained of problems with pain in both her right and left shoulders on occasion. An MRI of the left shoulder taken in January 2004 showed no significant abnormality. Thus, given all of these reasons, as the Commissioner notes in her brief, the ALJ obviously gave Mullins the benefit of the doubt in finding that she could perform a reduced range of light work.

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Mullins retained the physical capacity to perform light work that did not require the repetitive use of the left arm and that did not require work around dust, fumes, vapors and other respiratory irritants.

I next find that the ALJ's residual functional capacity finding with regard to Mullins's mental impairments also is supported by substantial evidence. The record reveals that Mullins has complained of depression, anxiety and panic attacks. At her hearing, she testified that she experienced weekly panic attacks lasting for an hour or more. (R. at 300.) She further testified that her treating physician, Dr. Boodram, had prescribed various psychotropic medications. (R. at 298-301.) On October 26, 2002,

Dr. Boodram diagnosed anxiety.  (R. at 178.)  She was again diagnosed with anxiety in February 2003, July 2003 and December 2003.  (R. at 146, 227, 233.)  On April 9, 2003, state agency psychologist Leizer concluded that Mullins suffered from a nonsevere anxiety-related disorder, noting no hospitalizations or treatment by any mental health professional.  (R. at 152-66.)  Leizer further noted that Mullins performed a wide array of daily activities, which Mullins contended were limited only by physical restrictions.  (R. at 166.)  While Mullins was seen at WCBHS, as the Commissioner notes in her brief, she was court ordered to do so for domestic violence abuse, her alcohol use and her husband's drug use.  (R. at 263-76.)  At that time, Mullins reported being off of alcohol, but continuing to struggle with depression and anxiety.  (R. at 268, 275.)  It was noted that Mullins experienced moderate fatigue, anxiety, jitteriness, panic attacks, worrying, depressed mood, irritability, insomnia and report of abuse or neglect.  (R. at 265-67.)  All other symptoms were rated as mild.  (R. at 265-67.)  Although Mullins was diagnosed with a GAF of 50, Dr. Schacht, another medical expert, testified that such a score was not, in itself, preclusive of work.  (R. at 311-12.)  He further noted that Mullins had achieved a GAF of 60 within the six-month period preceding the rendering of the GAF of 50, indicating that Mullins's problems were acute, not persistent.  (R. at 311-12.)  Dr. Schacht opined that Dr. Boodram prescribed various psychotropic medications not to treat psychiatric problems, but to facilitate smoking cessation.  (R. at 309.)  He further opined that it would be unnecessary to send Mullins for a consultative psychological examination given the lack of records regarding a mental impairment.  (R. at 310.)  Finally, Dr. Schacht testified to the difficulty of separating out Mullins's impairments from her primary diagnosis of alcohol abuse.  (R. at 312.)

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Mullins has the mental residual functional capacity to perform simple unskilled light work.

Lastly, Mullins argues that the ALJ erred by posing an incomplete hypothetical to the vocational expert, in that it disregarded Mullins's testimony. (Plaintiff's Brief at 10-13.) I disagree. It is well-settled that "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all ... evidence in the record, ... and it must be in response to proper hypothetical questions which fairly set out all claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citations omitted). The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979).

I find that Mullins's argument that the ALJ erred by failing to present a hypothetical to the vocational expert based on Mullins's testimony is simply incorrect. The ALJ specifically asked the vocational expert to consider an individual with the limitations as set forth in Mullins's testimony. (R. at 313.) The vocational expert testified that such an individual would not be able to work, noting that an individual who had to use a nebulizer at work generally could not perform any jobs. (R. at 314.) However, the ALJ concluded that Mullins's subjective allegations were not totally credible, thereby rejecting her testimony regarding the severity of her impairment and the frequency with which she testified she had to use inhalers and a nebulizer. Thus, Mullins's final argument hinges on the ALJ's credibility determination, not the hypothetical posed to the vocational expert.

-23-

It is the province of the ALJ to assess the credibility of a witness or a claimant. *See Hays*, 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. Furthermore, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). The ALJ must determine through examination of the objective medical evidence whether the claimant has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged, in the amount and degree alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594-96 (4th Cir. 1996). If the existence of such an impairment is established, the ALJ then must evaluate the intensity and persistence of the symptoms and the extent to which they affect the claimant's ability to work. *See Craig*, 76 F.3d at 594-95. Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence. *See Craig*, 76 F.3d at 595.

In reaching his decision, the ALJ noted that he considered all symptoms, including pain, and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence of record. (R. at 19.) The ALJ found that although Mullins testified to using inhalers four to five times a day for 10 minutes at a time and using a nebulizer, the objective evidence of record did not support a finding of limitations so severe as to preclude all work activity. (R.

-24-

at 19.)  The ALJ noted that while Mullins had some limitations resulting from respiratory difficulties, she continued to smoke cigarettes, against the strong advise of her physicians, which exacerbated her respiratory problems.  (R. at 19.)  As the Commissioner notes in her brief, such disregard for the need to stop smoking essentially moots the restrictions imposed by the ALJ to avoid all exposure to respiratory irritants as Mullins continues to voluntarily expose herself to such exacerbating conditions on a daily basis.  I further note that Mullins's credibility is adversely impacted by her claims of sobriety when there is evidence that she continues to drink.  For instance, on February 24, 2004, optometrist Botts and his technician noted a very strong odor of alcohol on Mullins's breath at her evaluation despite Mullins's claim that she did not drink or use drugs.  (R. at 257.)

For all of the foregoing reasons, I find that the ALJ posed a proper hypothetical to the vocational expert in reaching his determination of nondisability.  I further find that the ALJ's credibility determination is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 8th day of July, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-26-